**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Waren A. Usatine, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for C. Wonder LLC, *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>C. WONDER LLC, *et al.*,[1]<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASES NO. 15-<br><br>Chapter 11<br>(Joint Administration Pending)<br><br>**DECLARATION OF STEPHEN MAROTTA IN SUPPORT OF DEBTORS' "FIRST DAY MOTIONS"** |

I, STEPHEN MAROTTA, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. On the date hereof (the "**Filing Date**"), C. Wonder LLC ("**C. Wonder**"), CW International Holdings LLC ("**CW International**"), CW Holland LLC ("**CW Holland**"), C. Wonder Gift Cards Inc. ("**CW Gift**") and C. Wonder Transport LLC ("**CW Transport**"), as debtors-in-possession herein (the "**Company**" or the "**Debtors**"), commenced in this Court cases under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the

---

[1] The Debtors in these Chapter 11 cases are C. Wonder LLC; C. Wonder Gift Cards Inc.; C. Wonder Transport LLC; CW Holland LLC and CW International Holdings LLC.

"**Bankruptcy Code**").  I am the Chief Restructuring Officer and have served in that capacity since January 6, 2015.  I am fully familiar with the Debtors' day-to-day operations, businesses and financial affairs, and am duly authorized to make this Declaration on the Debtors' behalf.

2.  To minimize the potentially adverse effects which the commencement of these Chapter 11 cases may have on the Debtors' ability to continue operations and to facilitate an orderly transition into Chapter 11, the Debtors have filed certain "first day" motions and applications with the Court (individually, a "**First Day Motion**" and collectively, the "**First Day Motions**").  I am familiar with each of the First Day Motions and believe the relief sought therein is required to facilitate an orderly transition into Chapter 11 and avoid the immediate and irreparable harm the Debtors will suffer if they are not authorized to make certain essential payments and otherwise continue their business operations as requested in the First Day Motions.

3.  In accordance with the Local Rules and given the nature of these Chapter 11 cases, the Debtors have requested that the Court schedule a hearing at its earliest convenience to consider the First Day Motions.  The Debtors will continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.  I submit this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in support of the Debtors' voluntary Chapter 11 petitions and various motions and applications filed with the Court contemporaneously herewith.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and

information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. This Declaration is divided into three (3) parts. Part I describes the Debtors' businesses, history and prepetition organizational and debt structure. Part II describes the circumstances leading to the Chapter 11 filings. Part III sets forth the purpose of the Chapter 11 filings and the relief requested in the First Day Motions.

## I.    FACTUAL BACKGROUND

**A.    The Debtors' Organizational Structure[2]**

### (i)    The Debtors' U.S. Organizational Structure

6. C. Wonder was organized on August 11, 2010 as a limited liability company under the provisions of the Delaware Limited Liability Act. At the time of its formation, J. Christopher Burch ("**JCB**") was C. Wonder's sole member. On December 27, 2012, however, C. Wonder completed a private offering of its Class A-1 Units for an aggregate purchase price of approximately $35 million.[3] During 2013, C. Wonder completed another private offering of its Class A-1 Units and Class A-2 Units for approximately $40 million. As of the Filing Date, C. Wonder's members are as follows:

| Member | Number and Class of Units Held | Percentage Interest |
|---|---|---|
| JCB | 8,000,000 Class A Units | 72.99% |
| PRTN CW Holdings, LLC | 555,555 Class A-1 Units | 5.07% |
| GROWTHCO CW Holdings, LLC | 555,556 Class A-1 Units | 5.07% |

---

[2] A chart illustrating the Debtors' organizational structure is attached as **Exhibit A**.

[3] The C. Wonder operating agreement authorizes the issuance of five (5) classes of membership units: Common Units, Class A Units, Class A-1 Units, Class A-2 Units and Class B Units. The Class A, A-1 and A-2 Unit Holders are considered Preferred Members.

3

| Member | Number and Class of Units Held | Percentage Interest |
|---|---|---|
| JCBI II LLC | 857,144 Class A-2 Units | 7.82% |
| Access Industries Holdings LLC | 158,730 Class A-2 Units | 1.45% |
| Profits Interest Group | 833,350 Class B Units | 7.60% |

7. C. Wonder owns 100% of CW Gift, an Arizona corporation incorporated in September 2012. CW Gift was created to issue and manage C. Wonder's gift cards. That entity, however, is inactive and never conducted any business operations.

8. C. Wonder is also the sole member of CW Transport, a Delaware limited liability company, formed in August 2011. CW Transport does not conduct any business operations.

### (ii) The Debtors' International Organizational Structure

9. As set forth herein, beginning in 2013, C. Wonder began to focus on expanding its operations internationally. As a result, C. Wonder formed certain subsidiaries to operate its international business. Toward that end, CW International, a Delaware limited liability company, was formed on June 28, 2013. C. Wonder is the sole member of CW International.

10. Thereafter, in August 2013, non-debtor Creative Holdings C.V. ("**C.V.**"), a Dutch limited partnership was established. C. Wonder and CW International are the 99% limited partner and 1% general partner of C.V., respectively. Non-debtor C.V., in turn, is the sole member of CW Holland, a Delaware limited liability company organized in August 2013. CW Holland is the 1% owner of C. Wonder Holland Cooperatief U.A. ("**Coop**"). The remaining 99% of non-debtor Coop is owned by C.V.

11. Additionally, CW Holland is the 100% owner of C. Wonder Asia Limited, a Hong Kong corporation, created in December 2013.

53628/0001-11339872v4

**B.**     **General Overview of the Debtors' Business**

12. Founded by JCB, the Company is a specialty retailer with retail stores in the United States. The Company designs and markets women's clothing, jewelry, shoes, handbags and other accessories as well as select home goods under the C. Wonder brand. The Company currently offers these products through its four (4) remaining U.S. retail stores. The Company's materials and manufacturing were directly sourced globally, allowing it to introduce products under its own label at the best price for its customers without sacrificing design integrity. In fact, the average price of the Company's products was $50.

13. The Company's headquarters are located in New York. The Company also maintains two distribution centers in New Jersey, one for merchandise and the other for storage.

14. The Company opened its first retail store in New York in 2011. By 2014, the Company had expanded its operations to include 29 locations across 13 states including its flagship location in Soho, New York. The Company also sold products on its e-commerce site. Beginning in early 2014, the Company began to expand its operations internationally. In particular, through license (and sublicense) agreements, the Company licensed the C. Wonder brand to two (2) different foreign entities facilitating the opening of four (4) stores in Dubai and Kuwait by one of those parties. Additional international store openings were planned for early 2015 by both licensees.

15. At the height of its operations, the Company had approximately 600 employees. As of the Filing Date, the Debtors had approximately 158 employees, of which approximately 24 employees are full-time salaried employees and 134 are part-time hourly employees.

16. As of the Filing Date, the Debtors had assets with a book value of approximately $43.7 million and liabilities of approximately $61.0 million. For the 11 (eleven) months ended

November 29, 2014, the Debtors had net sales of approximately $51.1 million and a net loss of approximately $51.4 million.

### C. The Debtors' Pre-Petition Indebtedness

17. The Debtors do not have any secured debt. During 2014, however, JCB, C. Wonder's majority member, provided the Company with a $30 million unsecured convertible bridge loan which was ultimately increased to $45 million. As of the Filing Date, approximately $42 million remains outstanding on that loan.

18. As of the Filing Date, the Debtors have outstanding payables of approximately $6.0 million, including $2.5 million to their trade vendors. Additionally, the Debtors have substantial obligations to their landlords as a result of the early termination of many of their leasehold interests.

### II. FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILINGS

19. The Company has accumulated significant losses from operations since its inception. In 2013 and 2012, the Company lost approximately $59 million and $46 million respectively. As of December 28, 2013 and December 29, 2012, the Company had accumulated deficits of approximately $133 million and $74 million, respectively. The Company's negative operating performance is due, in large part, to an extremely competitive market for women's apparel and the still struggling national economy. Additionally, the Company attributes its underperformance, reduced margins and lack of liquidity to its substantial leasehold obligations. Many of the Company's leases have lengthy lease terms with onerous provisions, rendering its ability to close or relocate underperforming locations nearly impossible.

20. Before the Filing Date, the Debtors critically evaluated their long term business model. The Debtors initiated and explored alternative means to increase cash flow while at the same time implementing measures to control expenses and maximize cash flow. In the interim,

JCB provided the Debtors with a $45 million bridge loan (approximately $42 million of which was outstanding on the Filing Date) to fund the Debtors' mounting operating losses.

21. Beginning in August 2014, the Debtors began a series of layoffs of their employees. The Debtors continued to reduce their work force with additional layoffs in September and October of 2014. Simultaneously, the Debtors engaged A&G Realty Partners, LLC to negotiate with numerous landlords in hopes of terminating overly burdensome leases and streamlining store operations and costs by exiting 17 locations by year end. The intent had been to stabilize the Debtors' operations by downsizing the store operations, and thus the number of employees, while initiating a true wholesale channel for their business.

22. Although the negotiations with the landlords initially seemed promising and the Debtors began to take steps to exit the 17 stores, negotiations bogged down and, while the locations were closed, the work-out agreements were not finalized as anticipated.[4] The inability to consummate these agreements, along with poorer than expected sales in November 2014, led the Debtors to explore alternative means to resolve their liquidity issues. Ultimately, the Debtors were unable to secure sufficient liquidity to ensure they did not accrue liabilities to creditors and employees beyond their means to pay.

23. Given their severe liquidity constraints, the Debtors determined that a prompt and orderly wind-down of their operations was the best way to maximize value for the benefit of all parties-in-interest. In December 2014, the Debtors determined it would be in the best interest of their creditors to decrease operating costs by (i) reducing the number of corporate employees to those necessary to wind down the Debtors' affairs and (ii) closing an additional seven stores.

---

[4] The Debtors' North Park location had not yet been opened.

53628/0001-11339872v4

The Debtors continue to operate the remaining four stores (Soho, Flat Iron, Time Warner Center and Manhasset) to effectuate the sale of the remaining inventory.

24. Based on the foregoing, the Debtors decided that a Chapter 11 filing was the best option available for resolving all creditor claims and maximizing value. Contemporaneously with the commencement of these Chapter 11 cases, the Debtors entered into an Asset Purchase Agreement with Burch Acquisition LLC, an entity owned by JCB, whereby it has agreed to purchase certain of the Debtors' remaining assets, namely the Debtors' intellectual property and the leasehold interest and personal property associated with the Debtors' New York headquarters operation. The Debtors believe that a Chapter 11 filing, together with the sale of the Debtors' remaining assets, is in the best interests of the Debtors' estates.

### III.    THE PURPOSE OF THE CHAPTER 11 FILINGS

25. As described above, the Debtors have evaluated various restructuring options and determined that the best way to maximize value for the benefit of all stakeholders was to commence these Chapter 11 cases and pursue a sale of certain of their remaining assets. To avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' remaining operations, to facilitate the Debtors' orderly transition into Chapter 11 and to maintain value while the Debtors pursue a sale of their remaining assets, the Debtors have requested the Court to consider, on an expedited basis, the following First Day Motions:

(a) Motion for an Order Extending the Debtors' Time to File Schedules and Statements of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(a)(4) and 1007(c);

(b) Motion for an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Granting Other Related Relief;

(c) Motion for an Order: (A) Granting Interim Relief Pursuant to 11 U.S.C. § 366(b); (B) Authorizing the Payment of Adequate Assurance for Post-

|     | |
| --- | --- |
|     | Petition Utility Services; (C) Fixing Final Hearing Date to Determine Adequate Assurance; and (D) Granting Other Related Relief; |
| (d) | Motion for an Order Approving the Debtors' Retention of Prime Clerk LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c); |
| (e) | Motion for an Order: (I) Authorizing the Debtors to (A) Satisfy and, to the Extent Applicable, Directing Any Payroll Banks to Honor, Pre-Petition Gross Salaries, Payroll Taxes and Related Obligations to or for the Benefit of the Debtors' Employees, and (B) Honor, in their Discretion, Pre-Petition Sick, Vacation, Personal, and Similar Themed Days; and (II) Granting Other Related Relief; |
| (f) | Motion for an Administrative Order Establishing Procedures for Allowance and Payment of Interim Compensation and Reimbursement of Expenses to Professionals; |
| (g) | Motion Pursuant to 11 U.S.C. § 105(a) for an Order Authorizing the Debtors to Honor Customer-Related Claims, Programs and Obligations; |
| (h) | Motion for an Order Directing Card Processors to Honor their Contracts with the Debtors Pending Assumption or Rejection Under 11 U.S.C. §§ 365 and 105(a); |
| (i) | Motion for Entry of an Order Authorizing the Debtors to Pay Pre-Petition Sales Taxes Pursuant to 11 U.S.C. §§ 507(a)(8) and 105(a); |
| (j) | Motion for an Order Authorizing Rejection of Certain Unexpired Nonresidential Real Property Leases and Abandonment of Personal Property *Nunc Pro Tunc* to the Filing Date; |
| (k) | Motion for an Order Authorizing the Debtors to Engage Marotta, Gund, Budd & Dzera, LLC to Provide Crisis Management Services Including the Appointment of A Chief Restructuring Officer, Assistant Chief Restructuring Officer and Additional Personnel *Nunc Pro Tunc* to the Filing Date Under 11 U.S.C. § 363(b); |
| (l) | Motion for an Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System; (B) Authorizing the Debtors to Continue Using Their Bank Accounts and Business Forms; and (C) Waiving Compliance with Investment Guidelines Under 11 U.S.C. § 345(b); |
| (m) | Motion Pursuant to Sections 363 and 503 of The Bankruptcy Code, to the Extent Applicable, (A) Authorizing the Debtors to Continue Going Out Of Business Sales And Store Closings, (B) Waiving Compliance With Contractual Store Closing Sale Restrictions, (C) Authorizing the Debtors |

9

    to Pay Severance to Employees in Connection With Store Closings; and (D) Granting Other Related Relief; and

 (n) Motion for an Order Pursuant to Bankruptcy Code Sections 105(a), 363 and 554(a) and Bankruptcy Rule 2002 Authorizing and Approving Procedures for the Sale or Abandonment of De Minimis Assets, Free and Clear of Liens, Claims, Interests and Encumbrances.

26. The purposes of the First Day Motions include, among other things, to: (a) enable the Debtors to operate effectively, ease the Debtors' transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filings; (b) minimize disruption of the Debtors' limited remaining operations; and (c) maintain and bolster employee morale during the Debtors' Chapter 11 proceedings. Each of the First Day Motions is crucial to accomplishing the Debtors' objectives in Chapter 11.[5] Accordingly, the Debtors respectfully request the Court approve the First Day Motions.

---

[5] For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court and parties-in-interest to the respective First Day Motions.

53628/0001-11339872v4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2015

                                                                /s/ *Stephen Marotta*
                                                                STEPHEN MAROTTA

53628/0001-11339872v4

# EXHIBIT A

