**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for C. Wonder LLC, *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>C. WONDER LLC, *et al.*,[1]<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 15- 11127 (MBK)<br>Chapter 11<br>(Joint Administration Pending) |

**HEARING DATE AND TIME:**
January ____, 2015, at ___:___ __.m.

**ORAL ARGUMENT REQUESTED**

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR
AN ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR.
P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET
PURCHASE AGREEMENT FOR THE SALE OF CERTAIN OF THE
DEBTORS' REMAINING ASSETS; (2) APPROVING BIDDING PROCEDURES
AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING
(A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING
THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO
SELL CERTAIN OF THEIR REMAINING ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND TO ASSUME
AND ASSIGN CERTAIN RELATED EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (5) GRANTING OTHER RELATED RELIEF**

TO:    Honorable Judge
       of the United States Bankruptcy Court

---

[1] The Debtors in these Chapter 11 cases are C. Wonder LLC; C. Wonder Gift Cards Inc.; C. Wonder Transport LLC; CW Holland LLC and CW International Holdings LLC.

C. Wonder LLC, *et al.*, the within debtors-in-possession (the "**Debtor**"), by and through

their proposed counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., respectfully represent:

## I.     INTRODUCTION AND JURISDICTION

1.     This Verified Application is submitted in support of the Debtors' motion (the

"**Motion**") for an Order pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004

and 6006: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of Certain

of the Debtors' Remaining Assets; (2) Approving Bidding Procedures and Form, Manner and

Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider

Approving the Highest and Best Offer; (4) Authorizing the Debtors to Sell Certain of Their

Remaining Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume

and Assign Related Executory Contracts and Unexpired Leases; and (5) Granting Other Related

Relief (the relief requested in subparts (1) through (3) is referred to as "**Part I of the Motion**"

and the proposed Order granting Part I of the Motion, submitted herewith, is referred to as the

"**Bidding Procedures Order**"; the relief requested in subparts (4) and (5) is referred to as "**Part

II of the Motion**" and the proposed Order granting Part II of the Motion, submitted herewith, is

referred to as the "**Sale Order**").

2.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and

157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

3.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.     BACKGROUND

4.     On January 22, 2015 (the "**Filing Date**"), the Debtors filed voluntary petitions for

relief pursuant to Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

Since the Filing Date, the Debtors have remained in possession of their assets and continued

management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of

the Bankruptcy Code.

5.      A detailed description of the Debtors' businesses and facts precipitating the filing

of the Debtors' Chapter 11 proceedings is set forth in the Declaration of Stephen Marotta, the

Debtors' Chief Restructuring Officer, submitted in support of the Debtors' various "First Day

Motions" (the "**Marotta Declaration**").  Those facts are incorporated herein by reference.

6.      As set forth in the Marotta Declaration, the Debtors are a specialty retailer that

design and market women's clothing, jewelry, shoes, handbags and other accessories as well as

select home goods under the C. Wonder brand.  The Debtors opened their first retail store in

New York in 2011.  By 2014, the Debtors had expanded their operations to include 29 locations

across 13 states including their flagship location in Soho, New York.

7.      The Debtors accumulated significant losses since their inception due to

underperformance, reduced margins and lack of liquidity due to their substantial leasehold

obligations.  Before the Filing Date, the Debtors critically evaluated their long term business

model.  In that regard, the Debtors attempted to stabilize their operations by downsizing the store

operations, and thus the number of employees, while initiating a wholesale channel for their

business.  The Debtors, however, were unable to negotiate work-out agreements with all of their

landlords from the downsized store operations.  Given their severe liquidity constraints and

having failed to obtain additional funding, the Debtors determined that a prompt and orderly

wind-down of their operations was the best way to maximize value for the benefit of all parties-

in-interest.

53628/0001-11342644v3

8.     The Debtors currently offer their products through their four (4) remaining U.S. retail stores.  As of the Filing Date, the Debtors had assets with a book value of approximately $43.7 million and liabilities of approximately $61.0 million.

**A.     Factors that Precipitated Section 363 Sale of the Debtors' Assets**

9.     The Debtors have accumulated significant losses from operations since their inception.  In 2013 and 2012, the Debtors lost approximately $59 million and $46 million respectively.  As of December 28, 2013 and December 29, 2012, the Company had accumulated deficits of approximately $133 million and $74 million, respectively.  The Debtors' negative operating performance is due, in large part, to an extremely competitive market for women's apparel and the still struggling national economy.  Additionally, the Debtors attribute their underperformance, reduced margins and lack of liquidity to their substantial leasehold obligations.  Many of the Debtors' leases have lengthy lease terms with onerous provisions, rendering its ability to close or relocate underperforming locations nearly impossible.

10.     Before the Filing Date, the Debtors critically evaluated their long term business model.  The Debtors initiated and explored alternative means to increase cash flow while at the same time implementing measures to control expenses and maximize cash flow.  In the interim, on or about December 19, 2013, J. Christopher Burch ("**JCB**"), the Debtors' primary investor, provided the Debtors with an initial bridge loan in the original principal amount of $15 million to fund the Debtors' mounting operating losses.  The amount of that note was subsequently increased to $45 million.

11.     Beginning in August 2014, the Debtors began a series of layoffs of their employees.  The Debtors continued to reduce their work force with additional layoffs in September and October of 2014.  Simultaneously, the Debtors engaged A&G Realty Partners, LLC to negotiate with numerous landlords in hopes of terminating overly burdensome leases and

4

streamlining store operations and costs by exiting 17 locations by year end.  The intent had been

to stabilize the Debtors' operations by downsizing the store operations, and thus the number of

employees, while initiating a true wholesale channel for their business.

12.    Although the negotiations with the landlords initially seemed promising and the

Debtors began to take steps to exit the 17 stores, negotiations bogged down and, while the

locations were closed, the work-out agreements were not finalized as anticipated.[2]  The inability

to consummate these agreements, along with poorer than expected sales in November 2014, led

the Debtors to explore alternative means to resolve their liquidity issues.  Ultimately, the Debtors

were unable to secure sufficient liquidity to ensure they did not accrue liabilities to creditors and

employees beyond their means to pay.

13.    Given their severe liquidity constraints, the Debtors determined that a prompt and

orderly wind-down of their operations was the best way to maximize value for the benefit of all

parties-in-interest.  In December 2014, the Debtors determined it would be in the best interest of

their creditors to decrease operating costs by (i) reducing the number of corporate employees to

those necessary to wind down the Debtors' affairs and (ii) closing an additional seven stores.

The Debtors continue to operate the remaining four stores (Soho, Flat Iron, Time Warner Center

and Manhasset) to effectuate the sale of the remaining inventory.

14.    Based on the foregoing, the Debtors decided that a Chapter 11 filing was the best

option available for resolving all creditor claims and maximizing value.  Contemporaneously

with the commencement of these Chapter 11 cases, the Debtors entered into an Asset Purchase

Agreement (the "**APA**") with Burch Acquisition LLC (the "**Proposed Purchaser**") whereby the

Proposed Purchaser has agreed to purchase certain of the Debtors' remaining assets, namely the

---

[2] The Debtors' North Park location had not yet been opened.

Debtors' intellectual property and the leasehold interest and personal property associated with the Debtors' New York headquarters operation (the "**Assets**").  A copy of the APA is attached as **Exhibit A**.  The Debtors believe that a Chapter 11 filing, together with the sale of the Debtors' remaining assets, is in the best interests of the Debtors' estates.

### III.        SUMMARY OF THE MATERIAL TERMS OF THE APA [3]

15.       Pursuant to the terms and subject to the conditions of the APA, the Debtors, subject to a Court-approved auction and sale process and any higher and better offers in accordance with the proposed bidding procedures attached as Exhibit 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), will sell to the Proposed Purchaser their right, title and interest in and to the Assets and, in connection therewith, to assign to the Proposed Purchaser the Assumed Contracts and Leases.  The Proposed Purchaser will purchase the Assets and acquire the Assumed Contracts and Leases free and clear of liens and claims pursuant to Sections 363 and 365 of the Bankruptcy Code.

16.       The terms of the Proposed Purchaser's offer to purchase the Assets are set forth in the APA, and are summarized herein:

(a)                    Proposed Purchaser.  The Proposed Purchaser is an insider and is owned by JCB, the owner of approximately 73% of C. Wonder.

(b)                    Purchased Assets.  Pursuant to Section 2.1 of the APA, the Proposed Purchaser shall acquire the Assets, which shall include, among other things, (i) all tangible personal property at the Debtors' corporate offices located at 1115 Broadway, New York, New York, (ii) the Leases, together with all fixtures, structures, improvements and other appurtenances thereto and thereon, (iii) the Assumed Contracts and Lease, (iv) all interests of the Debtors in and to all Intellectual Property including Avoidance Actions related thereto, (v) all books and records of the

---

[3] The foregoing is only a summary of the APA.  The reader is urged to consult the APA for a complete and accurate description of its terms.  Any capitalized terms used but not otherwise defined in Section III hereof shall have the meanings ascribed to them in the APA.

Debtors, (vi) all marketing, advertising and promotional materials and product samples, (vii) Avoidance Actions against the Debtors' employees, (viii) all Claims that may exist by the Company against Burch Creative Capital, J. Christopher Capital LLC ("**BCC**") and their affiliates and subsidiaries under a Shared Services Agreement ("**SSA**") and (ix) all goodwill associated with the Business and/or the Assets,  See APA, § 2.1.

(c)        Excluded Assets.  Section 2.2 of the APA sets forth the Excluded Assets, which include, but are not limited to: (i) any Contracts and Leases that are not described in Section 2.1; (ii) cash and cash equivalents of the Debtors; (iii) the Purchase Price; (iv) Inventory; (v) accounts receivables and other receivables of the Debtors; (vi) all Avoidance Actions not described in Section 2.1; (vii) all rights, claims and causes of action of the Debtors that do not relate to the APA; (viii) all corporate books and records relating to the Debtors' organization and existence; and (ix) any shares of stock or equity interests in any subsidiaries of C. Wonder.   See APA, § 2.2.

(d)        Assumed Liabilities.  Section 2.3 of the APA sets forth the Assumed Liabilities which include (i) the Cure Amounts and post-closing liabilities under the Assumed Contracts and Leases, (ii) reimbursement of the post-petition liabilities under the Leases, net of any amount received by the Debtors under any sublease or other related agreements, (iii) the Debtors' liabilities to BCC under the SSA prior to or after the Closing Date, (iv) unpaid severance to employees as set forth on Schedule 2.3(a) up to $675,000; and (v) the return of the security deposit to Poppin Inc. in the amount of $65,000.  See APA, § 2.3.

(e)        Excluded Liabilities.  Pursuant to Section 2.4 of the APA, the Proposed Purchaser shall not assume or be obligated to pay any of the following Excluded Liabilities: (i) Liabilities which are not Assumed Liabilities; (ii) Liabilities associated with any of the Excluded Assets; (iii) Liabilities associated with any and all indebtedness of any Debtor for borrowed money not included in the Assumed Liabilities; (iv) Liabilities arising out of or in connection with claims, litigation and proceedings for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date; (v) penalties, fines, settlements, interests, costs and expenses arising out of or incurred as a result of any actual or alleged violation of any Law prior to the Closing Date; (vi) all Liabilities for Taxes attributable to the operation of the Business prior to the Closing Date; (vii) Liabilities arising out of or resulting from layoffs or termination of any employees by any Seller prior to Closing and/or the consummation of the Transactions, including, but not limited to any liabilities under the WARN Act; and (viii) all Liabilities for expenses relating to the negotiation and preparation of the APA and relating to the Transactions.   See APA, § 2.3.

7

(f)          <u>Cure Payments</u>.  The Proposed Purchaser shall pay all Cure Amounts with respect to the Assumed Contracts within ten (10) Business Days from the Closing Date in accordance with the Sale Order.  See APA, §6.2.

(g)          <u>Purchase Price</u>.  The aggregate purchase price for the Assets is $2,050,000.  See APA, § 2.5.

(h)          <u>Closing Date</u>.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place on the fifth (5th) Business Day after the satisfaction or waiver of the conditions set forth in Sections 8, 9 and 10 of the APA or such other time as the parties may agree.

(i)          <u>Representations and Warranties</u>.  The APA contains representations and warranties of the Debtors in Section 3 and of Proposed Purchaser in Section 4.

(j)          <u>Covenants</u>.  The APA contains covenants of the Debtors in Section 5.

(k)          <u>Bankruptcy Court Matters</u>.  The APA is subject to approval by the Bankruptcy Court and the consideration by the Debtors of higher or better competing bids.  See APA, §§  9.4 and 9.5.

(l)          <u>Conditions to Closing</u>.  The APA contains conditions to Closing in Section 10.  In particular, as a condition to the Debtors' obligations, the Proposed Purchaser has agreed to cause JCB to subordinate $20 million of his unsecured note.

(m)          <u>Termination</u>.  The APA contains termination provisions in Section 10.2.

17.    The Debtors seek authority to sell the Assets to the Proposed Purchaser on the terms and conditions set forth in the APA or to a higher and better bidder to be determined in accordance with the Bidding Procedures.  The Debtors believe that the sale of the Assets will maximize value for the benefits of their stakeholders.  The Debtors further believe that their securing the Proposed Purchaser as a "stalking horse" bidder and the Debtors' marketing of the Assets over the time period contemplated by the Bidding Procedures and the holding of the Auction will result in the highest and best price for the Assets.

### IV.        RELIEF REQUESTED AND BASIS THEREFOR

18.        The Debtors request that this Court, <u>inter alia</u>, (i) authorize the sale of the Assets

(the "**Sale**") to the Proposed Purchaser pursuant to the APA or to another Successful Bidder (as

defined in the Bidding Procedures) pursuant to a competing asset purchase agreement entered

into with such Successful Bidder in accordance with the Bidding Procedures, free and clear of all

liens, claims, encumbrances, and interests pursuant to Section 363(b), (f), (k), and (m), (ii)

approve the assumption and assignment of the Assumed Contracts and Leases pursuant to

Section 365 of the Bankruptcy Code, (iii) approve the APA as a stalking horse bid, the Bidding

Procedures and the form, manner and sufficiency of notice of the Sale, and (iv) grant such other

and further relief as appropriate.

### B.        The Bidding Procedures Are Reasonable and Appropriate

19.        The Debtors propose and respectfully request approval of the Bidding Procedures

attached as Exhibit 1 to the Bidding Procedures Order to govern the Auction and proposed Sale

of the Assets.

20.        The Debtors believe that the Bidding Procedures are appropriate under Sections

105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and

will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed

herein are designed to maximize the value received for the Debtors' assets by facilitating a

competitive bidding process in which all potential bidders are encouraged to participate and

submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice

and opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the

Debtors and all parties in interest can be assured that the consideration for the Assets will be fair

and reasonable.  At the same time, the Bidding Procedures provide the Debtors with the

opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Assets.

21.    In addition, the Debtors respectfully request that the Court schedule a hearing to confirm the results of the auction, if any, and to approve the Sale (the "**Sale Hearing**") no later than five (5) days after the date of the Auction.  The Debtors intend to market the Assets post-petition.  The Debtors firmly believe that their efforts to sell the Assets will have been maximized and, therefore, any delay in the date of the auction or the Sale Hearing will serve no meaningful purpose.  To the contrary, such delay will only cause the further decline in value of the Assets to the detriment of the Debtors, their creditors and estates.

**A.    The Debtors Should Be Authorized to Sell their Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code**

22.    Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1).[4]

23.    Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

24.    Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50

---

[4] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

53628/0001-11342644v3

(3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good

faith purchaser" standard to mean one who purchases "in good faith" and for "value."  Abbotts

Dairies, 788 F.2d at 147.

      25.     The Third Circuit in Abbotts Dairies then analogized the bona fides of a Section

363(b)(1) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198

(7th Cir. 1978)).

      26.     Finally, the Court noted that '[t]raditionally, courts have held that "[f]air and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the

appraised value of the assets."  Abbotts Dairies, 788 F.2d at 149; In re Karpe, 84 B.R. 926, 933

(Bankr. M.D. Pa. 1988).

      27.     Respectfully, the sale of the Assets in accordance with the APA and Bidding

Procedures satisfies the Abbotts Dairies test.  First, the Debtors have fully disclosed and

requested the Court's approval of the Bidding Procedures and all the terms and conditions of the

Sale and proposed auction, and intend to provide comprehensive notice of the sale as discussed

below.  See In re Colony Hill Assoc., 111 F.3d 269 (2d Cir. 1997) (determination of "good faith"

is based on traditional equitable principles, including whether there has been full disclosure to

the Bankruptcy Court).  In addition, the Debtors intend to market the Sale of the Assets post-

petition.  Given the prospect of securing a viable third-party bidder before the Filing Date, the

Debtors negotiated with the Proposed Purchaser for a commitment to buy the Assets.  After that

commitment was secured in principle, the APA was negotiated by the Debtors, their advisors, the

Proposed Purchaser and its advisors at arms' length, and the Debtors believe that the Purchase

Price and other consideration being provided under the APA such as, for example, the

assumption of the Assumed Liabilities and JCB's subordination of $20 million of unsecured

debt, represent reasonably equivalent value and fair consideration for the Assets.  Lastly, the

Debtors are hopeful that as a result of their intended notice of the Sale to all potentially interested

parties and marketing of the Assets post-petition, interested purchasers will be encouraged to

submit bids, attend the auction and generate a spirited bidding process.

28.     In addition to the Abbotts Dairies requirements (which, respectfully, the Debtors

clearly satisfy), courts typically require a sound business purpose to sell assets outside of a plan

of reorganization.  In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Del. & Hudson Ry.

Co., 124 B.R. 169, 175-76 (D. Del. 1991); In re Titusville Country Club, 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989);

In re Conroe Forge & Mfg. Corp., 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); In re Indus.

Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15,21 (Bankr. E.D. Pa. 1987).

Courts consider the following non-exhaustive list of factors in determining whether a sound

business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable

notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the

amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be

proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future

plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the

property sold; and (h) whether the asset is decreasing or increasing in value.  Lionel Corp., 722

F.2d at 1071; <u>Del. & Hudson Ry.</u>, 124 B.R. at 176; <u>In re Weatherly Frozen Food Grp., Inc.</u>, 149

B.R. 480, 483 (Bankr. N.D. Ohio 1992).  A debtor's showing of sound business justification

need not be unduly exhaustive.  Rather, a debtor is "simply required to justify the proposed

disposition with sound business reason." <u>In re Baldwin United Corp.</u>, 43 B.R. 888, 906 (Bankr.

S.D. Ohio 1984).

29.    Consideration of the above factors here unequivocally establishes that the sale

should be approved.  As discussed above, the Debtors will solicit proposals for the purchase of

the Assets before the proposed bid deadline and, based on the Debtors' marketing efforts, the

Debtors will have, under the circumstances, amply marketed the Assets before the proposed date

of the Sale Hearing.  The Debtors have proposed Bidding Procedures designed to maximize the

purchase price for the Assets.  Those Bidding Procedures and the form and manner of notice of

the sale have been submitted for approval to the Court and will ensure that any and all interested

parties will receive adequate notice of the Auction to allow for a competitive sale process.

30.    Furthermore, the terms of the APA satisfy not only the business judgment test but

also the higher scrutiny applied to insider transactions in Chapter 11 cases.  In light of the value

attributable to the Proposed Purchaser's proposal, the involvement of the Debtors' advisors in the

negotiation and documentation of the APA, and the terms of the APA itself, the Debtors submit

the proposed sale to the Proposed Purchaser (an insider) satisfies this heightened scrutiny.  <u>See,

e.g.</u>, <u>In re MEE Apparel LLC and MEE Direct LLC</u>, Case No. 14-16484 (Bankr. D.N.J. May 30,

2014) (approving sale to insider affiliate); <u>In re Summit Global Logistics, Inc.</u>, No. 08-11566,

2008 WL 819934, at *11-l2 (Bankr. D.N.J. Mar. 26, 2008) (approving sale of assets to insider

affiliate where the selling debtors demonstrated transparent process led by independent director

and reasonableness of consideration, among other factors); <u>see also</u> <u>In re Crown Village Farm</u>,

415 B.R. 86, 93 (Bankr. D. Del. 2009) (where a debtor seeks to enter into a transaction with an

insider (as defined under section 101(31) of the Bankruptcy Code), the transaction is subject to

heightened scrutiny, as required by non-bankruptcy law); In re Bidermann Indus. U.S.A., Inc.,

203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (holding that sales to insiders were "necessarily

subjected to heightened scrutiny because they are rife with the possibility of abuse").

31.    For all these reasons, the Debtors respectfully submit that the Sale of the Assets is

supported by sound business reasons and is in the best interests of the Debtors and their estates.

Accordingly, the Debtors request approval of the sale to the Proposed Purchaser, or the

Successful Bidder, pursuant to Section 363(b) of the Bankruptcy Code.

**B.    The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

32.    The Sale of the Assets will not necessitate the appointment of a consumer privacy

ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(1) of the

Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service
> discloses to an individual a policy prohibiting the transfer of
> personally identifiable information about individuals to persons
> that are not affiliated with the debtor and if such policy is in effect
> on the date of the commencement of the case, then the trustee may
> not sell or lease personally identifiable information to any person
> unless . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(1).

33.    Section 101(41A) defines "personally identifiable information" as an individual's

name, residence address, email address, telephone number, social security number or credit card

number, as well as an individual's birth date or other information that, if associated with the

information described previously, would permit the identification or contacting of the

individual."  11 U.S.C. § 101(41A).

34.    The Debtors' privacy policy provides as follows:

14

Business Transfers: If we are acquired by or merged with another company, if substantially all of our assets are transferred to another company, or as part of a bankruptcy proceeding, we may transfer the information we have collected from you to the acquiring company.

35.    Given that the Debtors' privacy policy contemplated the transfer of personal information, Section 363(b)(1) does not apply and the appointment of a consumer privacy ombudsman is not necessary.

**C.    The Debtors Should be Authorized to Sell their Assets Free and Clear of Liens, Claims and Interests Pursuant to Section 363(f) of the Bankruptcy Code**

36.    The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under Section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

(a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.    This statute authorizes the sale of assets "free and clear of any interest."  The term "any interest," as used in Section 363(f), is not defined in the Bankruptcy Code.  The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in Folger Adam Sec. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258 (3d Cir. 2000).  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem

interests in property," the trend in modern cases is towards a "broader interpretation which

includes other obligations that may flow from ownership of the property." Id. at 258.  In turn,

the Folger Adam Court cited with approval the Fourth Circuit's ruling in In re Leckie Smokeless

Coal Co., 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their

assets under § 363(f) free and clear of successor liability that otherwise would have arisen under

federal statute."  Folger Adam, 209 F.3d at 258.

38.     Here, the Debtors are unaware of any liens, claims, interests in or against the

Assets, but as a precautionary measure, request that the sale of the Assets to the Proposed

Purchaser be free and clear of any liens, claims or interests.

**D.      Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of
Section 363(n) of the Bankruptcy Code**

39.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

40.     Section 363(n) of the Bankruptcy Code, among other things, provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale.  The Third Circuit in Abbotts Dairies noted the kind of

misconduct that would destroy a buyer's good faith.  Abbotts Dairies, 788 F.2d at 147.

41.     While the Proposed Purchaser is owned by JCB, the APA represents a negotiated,

arms'-length transaction, in which the Proposed Purchaser has acted in good faith, without

collusion or fraud of any kind.  The terms of the APA were primarily negotiated by the Debtors'

professionals and the Proposed Purchaser's professionals.  Additionally, the Purchase Price is

significantly higher than what the Debtors believe they could recover in a liquidation.  Therefore,

the Debtors respectfully request that the Court find that the Proposed Purchaser has purchased

the Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and is

entitled to the protections of Sections 363(m) and 363(n) of the Bankruptcy Code.  If a party

other than the Proposed Purchaser emerges as the Successful Bidder, the Debtors intend to make

the appropriate showing at the Sale Hearing that such Successful Bidder satisfies the

requirements of "good faith" and similarly is entitled to relief under Sections 363(m) and 363(n).

**E.**      **The Debtors Should Be Authorized to Assume and Assign the Assumed Contracts and Leases**

42.      Section 365 allows the debtor in possession to "maximize the value of the

debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and

by rejecting those that do not.  Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001)

(quotations omitted).

43.      Under Section 2.3 of the APA and Schedule 2.3 of the APA, the Debtors shall

assume and assign the Assumed Contracts and Leases to the Proposed Purchaser on the Closing

Date.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all

defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults

under the Assumed Contracts and Leases assumed at Closing, shall be paid by Proposed

Purchaser, and the Debtors shall have no liability therefor.

44.      Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume

any executory contract or unexpired lease, subject to Court approval.  11 U.S.C. § 365(a).  The

requirements for assumption of executory contracts and unexpired leases, if there has been a

default thereunder, are set forth in Section 365(b)(1):

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or leases, the trustee -

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . .;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).

45.    Section 365 further provides that a debtor-in-possession may assign an executory contract or unexpired lease if: (i) it assumes the contract in accordance with the provisions of Section 365(b) of the Bankruptcy Code; and (ii) adequate assurance of future performance by the assignee is provided.  11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the meaning of "adequate assurance of future performance."  Courts have held that the words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption."  In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola, 248 F.3d at 120 n. 10 (3d Cir. 2001)). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

46.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

18

assigned.  See In re Bygaph, Inc., 56 B.R. 596,605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of a lease from debtor has

financial resources and has expressed a willingness to devote sufficient funding to business in

order to give it strong likelihood of succeeding; chief determinant of adequate assurance is

whether rent will be paid).  See also In re Vitanza, Case No. No. 98-19611-DWS, 1998 WL

808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it

appears that the rent will be paid and other lease obligations met.")

> 47.    Here, the assumption and assignment of the Assumed Contracts and Leases are a
necessary part of the APA, and the Debtors satisfy all the relevant requirements of Section 365
of the Bankruptcy Code.  First, pursuant to the APA, all cure amounts required to be paid to the
counterparties to the Assumed Contracts must be paid by the Proposed Purchaser.  As reflected
in the Bidding Procedures Order, the counterparties to the Assumed Contracts and Leases will
have sufficient opportunity to review and object to the Debtors' cure statement (the "**Cure
Statement**"), which reflects the amounts the Debtors believe are due and owing to the non-
debtor parties as of the Filing Date and will be filed with the Court and served on the counter-
parties within two (2) weeks after entry of the Bidding Procedures Order.  In the event any
potential disputes to the updated Cure Statement cannot be resolved consensually, the Debtors
will request that the Court schedule a hearing to adjudicate the dispute and will escrow sufficient
funds to pay those amounts pending Court Order.

> 48.    The Debtors also request approval of the proposed Notice to Counterparties to
Executory Contracts and Unexpired Leases That May Be Assumed and Assigned (the "**Notice of
Assumption and Assignment**") substantially in the form attached as Exhibit 3 to the Bidding
Procedures Order.  The Notice of Assumption and Assignment is intended to provide

counterparties to the Assumed Contracts and Leases with the Cure Statement for their applicable

Assumed Contracts and Leases and simplified instructions of how they need to proceed with

respect to the proposed assumption and assignment of their respective Assumed Contracts to The

Proposed Purchaser or the Successful Bidder.

49.     The Proposed Purchaser or Successful Bidder will demonstrate at the Sale

Hearing adequate assurance of future performance under the Purchased Contracts and Leases,

including to the extent required by Section 365(b)(3).  Accordingly, given the requirements of

Section 365 of the Bankruptcy Code are satisfied, the Debtors should be authorized to assume

and assign the Assumed Contracts and Leases to the Proposed Purchaser or Successful Bidder.

**F.      The Notice Provisions and Procedures Are Reasonable and Appropriate**

50.     Pursuant to Fed. R. Bankr. P. 2002(a) and (c), the Debtors are required to notify

creditors of the proposed sale of the Assets, including a disclosure of the time and place of the

Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.

51.     The Debtors submit that the notice procedures described above fully comply with

Fed. R. Bankr. P. 2002 and are reasonably calculated to provide timely and adequate notice of

the proposed sale of the Assets, the Bidding Procedures, the Auction, the Cure Amount, and the

Sale Hearing to the Debtors' creditors and all other parities-in-interest that are entitled to notice,

as well all those parties that have expressed a *bona fide* interest in acquiring the Purchased

Assets.

52.     Based upon the foregoing, the Debtors respectfully request that the Court approve

the notice procedure proposed above, including the form and manner of service of the Sale

Notice attached as Exhibit 4 to the Bidding Procedures Order.

**G.**    **Relief Under Bankruptcy Rule 6004(h) and 6006(d)**

53.    Pursuant to Fed. R. Bankr. P. 6004(h), unless the Court orders otherwise, all
orders authorizing the sale of the assets pursuant to Section 363 of the Bankruptcy Code are
automatically stayed for fourteen (14) days after entry of the order.  The purpose of Rule 6004(h)
is to provide sufficient time for an objecting party to request a stay pending appeal before the
order can be implemented.  Additionally, Fed. R. Bankr. P. 6006(d) provides that "[a]n order
authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed
until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

54.    The purpose of Fed. R. Bankr. P. 6004(h) and 6006(d) is to provide sufficient
time for an objecting party to appeal before an order can be implemented.  See Advisory
Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Fed. R. Bankr. P. 6004(h)
and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order
otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests
that the stay period should be eliminated to allow a sale or other transaction to close immediately
"where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY, ¶ 6004.10
at 6004-18 (L. King., 15th rev. ed. 2008).  The treatise further provides that if an objecting party
informs the court of its intent to appeal, the stay may be reduced to the amount of time actually
necessary to file such appeal.  Id.

55.    To maximize the value received for the Assets and minimize accruing liabilities,
the Debtors seek to consummate the sale of the Assets to the Successful Bidder as soon as
possible following the Sale Approval Hearing.

56.    Accordingly, the Debtors request that the Court waive the fourteen-day stay
period under Fed. R. Bankr. P. 6004(h) and 6006(d) or, in the alternative, if an objection to the

proposed sale of the Assets is filed, reduce the stay period to the minimum amount of time

needed by the objecting party to file its appeal.

## V.    <u>NOTICE</u>

57.    Notice of this Motion is being provided to (i) the United States Trustee, (ii) the

holders of the twenty largest unsecured claims against each of the Debtors, (iii) all counterparties

to executory contracts and the unexpired leases, (iv) any entity that has expressed a *bona fide*

interest in acquiring the Debtors' assets, (v) the Securities and Exchange Commission, (vi) the

Internal Revenue Service, (vii) the United States Department of Justice and (viii) all parties

having filed requests for notices in these Chapter 11 cases.

58.    Due to the nature of the relief requested herein, the Debtors submit that no other

or further notice need be given.

## VI.    <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court grant the Motion by

entering the Bidding Procedures Order and Sale Order, and such other relief as the Court deems

just and appropriate under the circumstances.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Attorneys for C. Wonder LLC, *et al.*,
Debtors-in-Possession

By:___*/s/ Michael D. Sirota*_____
        Michael D. Sirota, Esq.
        Warren A. Usatine, Esq.
        Felice R. Yudkin, Esq.

DATED:  January 22, 2015

## <u>VERIFICATION</u>

STEPHEN MAROTTA, of full age, certifies as follows:

1.      I am the Chief Restructuring Officer of C. Wonder LLC, *et al.*, the within debtors-in-possession (the "**Debtors**").  As such, I have full knowledge of the facts set forth in and am duly authorized to make this Verified Application on the Debtor's behalf.

2.      I have read the foregoing Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

DATED:  January 22, 2015

　　　　　　　　　　　　　　　　　　　　　　 /s/      *Stephen Marotta*
　　　　　　　　　　　　　　　　　　　 STEPHEN MAROTTA

53628/0001-11342644v3